IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**ALI DOROBATI**                                                                              **PLAINTIFF**

v.                                         Case No. 4:24-cv-00743-LPR

**ERIC GAUDIOSI, Deputy Chief of Mission,**
**U.S. Embassy in the United Arab Emirates**                                 **DEFENDANT**

## ORDER

This is an immigration case. The facts and procedural history are relatively straightforward and largely undisputed. Plaintiff Ali Dorobati is a U.S. citizen.[1] He petitioned for his wife, an Iranian national, to receive a visa.[2] In October of 2023, Mr. Dorobati's wife was interviewed at the U.S. Embassy in the United Arab Emirates.[3] Following that interview, a consular officer refused her application and referred the application for administrative processing.[4] Since then, the application has remained in administrative processing.[5]

In September of 2024, Mr. Dorobati filed a Petition for Writ of Mandamus and Complaint for Injunctive Relief, seeking "to compel the [Secretary of State and the Deputy Chief of Mission of the United States Embassy in the United Arab Emirates] to take action on and adjudicate his wife's properly-filed I-130 visa application."[6] Defendants moved to dismiss all the claims set out

---

[1] Pet. for Writ of Mandamus and Compl. for Injunctive Relief (Doc. 1) ¶ 11.

[2] *See id.* ¶¶ 2, 8, 17.

[3] *Id.* ¶ 23.

[4] *Id.* ¶¶ 23–24; Ex. A (Electronic Visa Application Status) to Pl.'s Opp'n to Defs.' Mot. to Dismiss (Doc. 12-1) at 1. The historical facts that the consular officer refused Mr. Dorobati's wife's application under § 221(g) of the Immigration and Nationality Act and that the officer referred the application for administrative processing are not disputed. *Compare* Def.'s Mot. for Recons. (Doc. 27) at 6, *with* Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 2–3, 6, 11, 14. But the legal implications of that refusal-and-referral are highly disputed by the parties. *Compare* Def.'s Mot. for Recons. (Doc. 27) at 9, 12–16, *with* Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 10–16.

[5] Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 4.

[6] Doc. 1 ¶ 1.

in the Petition and Complaint.[7]  After adversarial briefing, the Court granted the Motion in part and denied it in part.[8]  Specifically, the Court (1) dismissed all claims against the Secretary of State, (2) dismissed all Due Process claims, and (3) let the Mandamus Act and Administrative Procedure Act claims against the Deputy Chief of Mission move forward.[9]  Shortly thereafter, as required by the Federal Rules of Civil Procedure, the Deputy Chief filed an Answer.[10]

This all occurred in front of a different judge.  In April of 2025, that judge recused and the case was reassigned through our District's normal lottery process.[11]  A post-reassignment review of the case raised serious doubts about whether the Motion to Dismiss had been correctly decided.[12]

---

[7] Defs.' Mot. to Dismiss (Doc. 11).

[8] *See* Mar. 21, 2025 Order (Doc. 15).

[9] *Id.* at 2, 11.  In light of that dismissal Order, the Secretary of State is no longer a party to this case.  The instant Motion is brought solely by the Deputy Chief of Mission, the only remaining Defendant in this case.  *See generally* Def.'s Mot. for Recons. (Doc. 27).

[10] *See* Doc. 16; Fed. R. Civ. P. 12(a)(4)(A).

[11] *See* Notice of Reassignment (Doc. 17).

[12] That the former presiding judge and the current presiding judge see things differently is not particularly surprising.  The legal issues at play here are the subject of a deep (and growing) split of authority among federal courts.  *See Al Khalo v. Goldman*, 769 F. Supp. 3d 899, 903–04 (D. Neb. 2025) (collecting cases).  And the Eighth Circuit has not had occasion to definitively address these legal issues.  *Id.* at 903.  Against this background, it's easy to imagine different trial judges in our District reaching different conclusions on the points in question.  In more banal circumstances, efficiency concerns might counsel the current presiding judge to simply accept the motion-to-dismiss-stage decision of the former presiding judge and move the case to its next stage.  But, in this case, the Judiciary is being asked to force a coordinate branch of government to take specific actions in an area where government power is traditionally "exercised by the Government's political departments [and] largely immune from judicial control." *Dep't of State v. Muñoz*, 602 U.S. 899, 907 (2024) (internal quotation marks omitted) (quoting *Trump v. Hawaii*, 585 U.S. 677, 702 (2018)).  In such circumstances, any efficiency concerns are dwarfed by much more serious constitutional considerations like the separation of powers.  Albeit in a slightly different context, the Supreme Court has recently cautioned against "an imperial Judiciary" and has repeatedly reigned in lower courts whose decisions have exceeded their bounds.  *Cf. Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 155 F.4th 1099, 1108 (9th Cir. 2025) (Bumatay & VanDyke, JJ., dissenting from denial of reh'g en banc) (internal quotation marks omitted) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025)); *see id.* (collecting cases).  And it cannot be ignored that the problem of judicial imperialism has been "especially pronounced in the immigration-enforcement context." *Ramos v. Att'y Gen.*, No. 25-2946, 2025 WL 2950133, at *3 (3d Cir. Oct. 17, 2025) (Bove, J., concurring in denial of stay pending appeal).  This Court will not become part of the problem just for the sake of sticking with a prior judge's decision.

Accordingly, the Court invited the parties to move for reconsideration of the Order on the Motion to Dismiss.[13] The Deputy Chief took the Court up on that invitation.[14]

Now, having considered the Motion for Reconsideration and Mr. Dorobati's Response, the Court GRANTS the Motion for Reconsideration. Mr. Dorobati's Mandamus Act and APA claims should have been dismissed the first time around.[15] Even assuming the Court has the statutory and constitutional authority to compel the State Department to make a visa application determination—and that is quite an assumption—the State Department already made such a determination in the instant case. The consular officer refused the visa application. And there's definitely no duty for the State Department to do more than that.

## I.   STATUTORY BACKGROUND

The Immigration and Nationality Act—in conjunction with regulations promulgated by the State Department pursuant to the INA—governs the visa application process.[16] The INA establishes a preference for relatives of U.S. citizens, streamlining the process for those relatives

---

[13] *See* July 14, 2025 Hr'g Tr. (Doc. 26) at 3–4. The Court also invited Mr. Dorobati to ask the Court to reconsider the portions of the Order that dismissed his Due Process claims and his claims against the Secretary of State. *See id.* at 33. Mr. Dorobati accepted that invitation. *See* Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 22–23. But, on these two issues, the Court agrees with the former presiding judge's decision and the reasoning provided in his initial Order. *See* Mar. 21, 2025 Order (Doc. 15) at 3, 10. The Court's analysis is therefore limited to assessing Mr. Dorobati's APA and Mandamus Act claims against the Deputy Chief.

[14] *See* Def.'s Mot. for Recons. (Doc. 27).

[15] Because the Court originally denied the Motion to Dismiss with respect to the Mandamus Act and APA claims against the Deputy Chief of Mission, the Deputy Chief was required to file an Answer. *See* Mar. 21, 2025 Order (Doc. 15) at 7–11; Fed. R. Civ. P. 12(a)(4)(A). The Court does not believe that the filing of an Answer precludes a subsequent motion seeking reconsideration of the ruling on the Motion to Dismiss. *See* Fed. R. Civ. P. 54(b). Even if it did—for example, as an implicit extension of the Rule 12 requirement to file motions to dismiss prior to filing answers—the Court could simply treat the Motion for Reconsideration as a Motion for Judgment on the Pleadings. *Cf. Nordgren v. Hennepin Cnty.*, 96 F.4th 1072, 1077 (8th Cir. 2024) ("[I]t is 'the substance of a motion rather than the form of a motion [that] is controlling.'" (second alteration in original) (quoting *BBCA, Inc. v. United States*, 954 F.2d 1429, 1431–32 (8th Cir. 1992))). And, in deciding a Motion for Judgment on the Pleadings, the Court does not believe it would be bound by the legal analysis of the prior judge presiding over this case. *See* Fed. R. Civ. P. 54(b); *First Union Nat'l Bank v. Pictet Overseas Tr. Corp., Ltd.*, 477 F.3d 616, 620 (8th Cir. 2007) ("[The law of the case doctrine] does not apply to interlocutory orders . . . 'for they can always be reconsidered and modified by a district court prior to entry of a final judgment.'" (quoting *United States v. Hively*, 437 F.3d 752, 766 (8th Cir. 2006))).

[16] *Hassan v. Bitter*, 748 F. Supp. 3d 722, 728 (D. Neb. 2024).

to apply for visas.[17] That process starts with a U.S. citizen filing a petition—on behalf of a non-citizen relative—with U.S. Citizenship and Immigration Services (USCIS).[18] The Petition is titled "Petition to Classify Status of Alien Relative for Issuance of an Immigrant Visa."[19] USCIS's role is to determine whether the non-citizen is in fact an "immediate relative" of the U.S. citizen.[20]

If USCIS determines that the non-citizen relative is in fact an "immediate relative" of the U.S. citizen, USCIS will approve the petition and pass it along to the State Department.[21] The State Department will first use the petition (along with other documents) to determine whether the non-citizen relative is "documentarily qualified" to apply for a visa.[22] Being "documentarily qualified" means that the non-citizen relative has provided all the necessary documentation, paid the necessary fees, and surmounted certain clearance procedures to apply for a visa.[23] Once deemed "documentarily qualified," the non-citizen relative will be interviewed (outside of the United States) by a consular officer.[24] At that interview, the non-citizen relative will, among other things, execute a visa application.[25]

Following the interview, a consular officer must either issue or refuse the visa.[26] The consular officer must refuse a visa if "(1) it appears to the consular officer, from statements in the

---

[17] *Muñoz*, 602 U.S. at 904.

[18] *See id.*; 8 U.S.C. §§ 1151(b)(2)(A)(i), 1154(a)(1)(A); 8 C.F.R. §§ 204.1, 204.2.

[19] *See* 22 C.F.R. § 42.21(a). The Petition is also known as a Form I-130, Petition for Alien Relative. *See* 8 C.F.R. § 204.1(a)(1).

[20] *See* 8 U.S.C. § 1151(b)(2)(A)(i).

[21] *See id.* § 1154(b); 8 C.F.R. § 204.2(a)(3).

[22] *See* 22 C.F.R. § 40.1(h).

[23] *See id.*; *Hassan*, 748 F. Supp. 3d at 729.

[24] *See* 8 U.S.C. §§ 1201(a)(1), 1202; 22 C.F.R. §§ 42.61, 42.62.

[25] *See* 8 U.S.C. §§ 1201(a)(1), 1202; 22 C.F.R. § 42.62.

[26] 22 C.F.R. § 42.81(a); *see also* 8 U.S.C. § 1201(g) (establishing the grounds for which a consular officer must refuse issuance of a visa). The Court acknowledges that there is a third option: "pursuant to an outstanding order under INA 243(d)," a consular officer can "discontinue granting the visa." 22 C.F.R. § 42.81(a). That option relates to situations where the Secretary of State has ordered consular officers to discontinue granting visas in a certain country as a

application, or in the papers submitted therewith, that such alien is ineligible to receive a visa . . . , (2) the application fails to comply with the provisions of this chapter, or the regulations issued thereunder, or (3) the consular officer knows or has reason to believe that such alien is ineligible to receive a visa . . . ."[27] Otherwise, the consular officer must issue the visa.

It is worth noting that a consular officer's refusal of a visa application is not always a permanent death knell for that visa application. For one thing, federal regulations create a review process that allows a higher consular officer to evaluate the refusal.[28] Even putting this higher-officer review aside, where "the ground of ineligibility" that caused the refusal "may be overcome by the presentation of additional evidence and the applicant indicates an intention to submit such evidence," a line consular officer can await such evidence and, if appropriate, reconsider the refusal.[29]

## II. FACTUAL BACKGROUND

In May of 2020, Mr. Dorobati filed with USCIS (on behalf of his wife) a Petition to Classify Status of an Alien Relative for Issuance of an Immigrant Visa.[30] In December of 2020, USCIS approved the petition.[31] In October of 2023, Mr. Dorobati's wife was interviewed at the U.S.

---

country-wide and categorical sanction. *See* 8 U.S.C. § 1253(d); 22 C.F.R. § 42.84. That option is not relevant to the instant case. No party contends otherwise. So, the Court will only refer to two options when discussing the possible options that the consular officer had in this case.

[27] 8 U.S.C. § 1201(g).

[28] 22 C.F.R. § 42.81(c).

[29] *Id.* § 42.81(b); *see also* § 42.81(e).

[30] *See* Pet. for Writ of Mandamus and Compl. for Injunctive Relief (Doc. 1) ¶¶ 2, 17.

[31] *Id.* ¶ 18.

Embassy in the United Arab Emirates.[32] After the interview, the consular officer refused the visa application and referred it for administrative processing.[33]

What is administrative processing? That's a fair question. Neither the governing statutes nor the relevant regulations discuss such a thing. Administrative processing appears to be an informal creation of the State Department for circumstances in which a consular officer determines that more information may be helpful in establishing a refused applicant's visa eligibility.[34] In such circumstances, after receiving more information—from either the applicant or other sources—a consular officer may conclude that the previously-refused applicant is qualified to receive a visa and thus reverse the refusal.[35]

It appears that, in general and specifically in the instant case, the State Department assumes administrative processing will end with what the Department sees as a second adjudication of the visa application at issue. The Department's case file on the visa application of Mr. Dorobati's wife includes the following note from November 2, 2023:

> A U.S. consular officer has adjudicated and refused your visa application. Please follow any instructions provided by the consular officer. If you were informed by the consular officer that your case was refused for administrative processing, your case will remain refused while undergoing such processing. You will receive another adjudication once such processing is complete. Please be advised that the processing time varies and that you will be contacted if additional information is

---

[32] *Id.* ¶ 23.

[33] *See id.* ¶¶ 24–25; Ex. A (Electronic Visa Application Status) to Pl.'s Opp'n to Defs.' Mot. to Dismiss (Doc. 12-1) at 1. The Petition and Complaint does not expressly allege that the consular officer refused the visa application. But it quite clearly does so by implication. *See* Pet. for Writ of Mandamus and Compl. for Injunctive Relief (Doc. 1) ¶¶ 24–25 ("After the interview, [Mr. Dorobati's wife] learned that this case was placed in administrative processing pursuant to the Immigration and Nationality Act ('INA') § 221(g). . . . A 'refusal' under INA § 221(g) places an application into a status called 'administrative processing.'"). Moreover, in the Response to the Motion for Reconsideration, Mr. Dorobati repeatedly acknowledges that the visa application was refused after his wife's interview with the consular officer. *See, e.g.*, Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 1–3, 11–15, 18–20.

[34] *See* U.S. DEP'T OF STATE, *Administrative Processing Information* (last visited Dec. 17, 2025), https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/administrative-processing-information.html.

[35] *See id.*

6

>needed.  For more information, please visit TRAVEL.STATE.GOV or the website for the Embassy or Consulate at which you made your visa application. . . .[36]

There is no specific timeframe for a consular officer to make what the Department sees as a second adjudication of a previously-refused application referred for administrative processing.[37]

### III.     LEGAL ANALYSIS

The circumstances in which federal courts can compel an executive agency to act are extremely limited.[38]  Where such judicial intervention is authorized and constitutional, the Mandamus Act and the APA are the typical routes available for judicial review.[39]  Relying on these statutes, Mr. Dorobati seeks to compel action on his wife's application, claiming that the Deputy Chief "retain[s] a mandatory, non-discretionary duty to review and adjudicate his wife's visa application through conclusion and within a reasonable time."[40]  The crux of Mr. Dorobati's argument is that (1) he is statutorily entitled to a final decision on his wife's application, and (2) the consular officer's action—refusing the visa application and referring it for administrative processing—does not constitute a final decision.

Under the Mandamus Act, "district courts shall have original jurisdiction of any action . . . to compel an officer or employee of the United States or any agency thereof to perform a duty

---

[36] Ex. A (Electronic Visa Application Status) to Pl.'s Opp'n to Defs.' Mot. to Dismiss (Doc. 12-1) at 1.

[37] *See id.*; U.S. DEP'T OF STATE, *Administrative Processing Information* (last visited Dec. 17, 2025), https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/administrative-processing-information.html.

[38] *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66–67 (2004) ("The principal purpose of the APA limitations . . . and of the traditional limitations upon mandamus from which they were derived . . . is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.  If courts were empowered to . . . compel[] compliance with broad statutory mandates, they would necessarily be empowered . . . to determine whether compliance was achieved[,] . . . injecting the judge into day-to-day agency management."); *Doan v. I.N.S.*, 160 F.3d 508, 509 (8th Cir. 1998) ("Administrative decisions excluding aliens are not subject to judicial review unless there is a clear grant of authority by statute.").

[39] *See* 28 U.S.C. § 1361; 5 U.S.C. § 706(1).

[40] Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 4.

owed to the plaintiff."[41]  Mandamus, however, is reserved solely for "extraordinary situations and when the plaintiff can establish (1) 'a clear and indisputable right to the relief sought,' (2) the state officer 'has a nondiscretionary duty to honor that right,' and (3) there is 'no other adequate remedy.'"[42]  Thus, "'for mandamus to lie[,] the duty owed to the plaintiff must be ministerial and a positive command so plainly prescribed as to be free from doubt.'"[43]  Similarly, the APA allows courts to "compel agency action unlawfully withheld or unreasonably delayed . . . ."[44]  But an unreasonable-delay claim under the APA "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."[45]

      Given the foregoing, the dispositive question here is whether the Deputy Chief owes Mr. Dorobati some mandatory, nondiscretionary duty above and beyond the consular officer's decision to refuse the visa application and refer it to administrative processing.  If the Deputy Chief owes Mr. Dorobati such a duty, Mr. Dorobati's Mandamus Act and APA claims can proceed.  If no such duty exists, the claims cannot proceed.  Because the analyses of the two claims completely overlap—at least for purposes of our case—the Court evaluates both claims together.[46]

---

[41] 28 U.S.C. § 1361.

[42] *Mitchael v. Colvin*, 809 F.3d 1050, 1054 (8th Cir. 2016) (quoting *Castillo v. Ridge*, 445 F.3d 1057, 1060–61 (8th Cir. 2006)).

[43] *Id.* (alteration in original) (quoting *Keeny v. Sec'y of the Army*, 437 F.2d 1151, 1152 (8th Cir. 1971)).

[44] 5 U.S.C. § 706(1).

[45] *Norton*, 542 U.S. at 64 (emphasis in original).

[46] The Deputy Chief primarily argues that these claims should be dismissed as a matter of subject matter jurisdiction under Rule 12(b)(1).  *See* Def.'s Mot. for Recons. (Doc. 27) at 23.  Whether failing to show a nondiscretionary duty for APA or Mandamus Act purposes is a jurisdictional issue under Rule 12(b)(1) or a failure-to-state-a-claim issue under Rule 12(b)(6) is unclear based on Supreme Court precedent.  *See Org. for Competitive Markets v. U.S. Dep't of Agric.*, 912 F.3d 455, 461–62 (8th Cir. 2018).  That distinction, however, is not important for the case at bar for two reasons.  First, no matter which way the Court treats the Motion to Dismiss—whether as a Rule 12(b)(1) or as a Rule 12(b)(6) motion—Mr. Dorobati's claims cannot progress past the motion-to-dismiss stage.  *See id.*  Second, the Court has determined that this is a facial attack on jurisdiction, meaning that the Court applies the same standard as it would for a Rule 12(b)(6) motion.  *See Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) ("A court deciding a motion under Rule 12(b)(1) must distinguish between a facial attack and a factual attack on jurisdiction. . . .  In a facial attack, the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." (internal quotation marks and citations omitted)

The Mandamus Act and the APA do not, in and of themselves, create any duty for the Deputy Chief to act.[47] Instead, any duty that Mr. Dorobati asserts must (at least partially) derive from provisions in the INA or that law's corresponding regulations. Mr. Dorobati concedes this.[48] He also concedes that no statutory provision of the INA, on its own, creates the duty he must establish.[49] According to Mr. Dorobati, however, certain "laws and regulations *in conjunction with one another* require Defendant[] to review and adjudicate visa applications . . . through conclusion and within a reasonable time . . . ."[50]

The logical chain of Mr. Dorobati's argument is pretty straightforward. He says that 8 U.S.C. § 1202(b) mandates a review and adjudication of his wife's visa application.[51] Building on this asserted mandate, Mr. Dorobati then says that § 555 of the APA requires that the review and adjudication required by § 1202(b) must "conclude [the] matter presented" and must do so "within a reasonable time."[52] According to Mr. Dorobati, these statutory commands combine to

---

(quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990))); *see also supra* note 4 (explaining that the matters at issue here are legal, not factual, disputes). The Court reads the record on a Rule 12(b)(6) motion to dismiss in a very specific way. The Court accepts as true all historical fact allegations contained in the Complaint. *See Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002). But the Court may not, and should not, accept conclusory allegations of fact or law as true. *See id.* ("While the court must accept allegations of fact as true when considering a motion to dismiss, the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations.").

[47] Although the individual adjudication actions in this case are not conducted by the Deputy Chief himself, the Deputy Chief maintains "full responsibility for the direction, coordination, and supervision of all Government executive branch employees in that country," 22 U.S.C. § 3927, including the "powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas," 8 U.S.C. § 1104(a). So, in the instant case, any references in statutes or regulations to the duties of a consular officer apply equally to the Defendant Deputy Chief.

[48] Pl.'s Opp'n to Defs.' Mot. to Dismiss (Doc. 12) at 10 ("Here, Plaintiff recognizes that the APA alone does not require Defendants to act. It is evident that in the INA generally[,] and 8 U.S.C. § 1202(b) specifically, there exists a nondiscretionary duty to adjudicate all visas 'through conclusion' as recognized by the State Department itself . . . , and the APA overlays a requirement that all adjudications must be completed within a reasonable time (5 U.S.C. § 555(b)) and adjudication not be unreasonably or illegally withheld (5 U.S.C. § 706(1)).").

[49] Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 16.

[50] *Id.* (emphasis added).

[51] Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 6, 17.

[52] *Id.* at 8 (internal quotation marks omitted); *see also id.* at 6–7, 15, 18; 5 U.S.C. § 555.

produce a mandatory, nondiscretionary duty to "render[] a final decision as to [his wife's] visa application within a reasonable time and through conclusion."[53] And because the visa application at issue is still in administrative processing, Mr. Dorobati contends his wife "has not received a **final** adjudicative decision as to her eligibility for admission into the United States."[54]

Mr. Dorabati's position is essentially the position adopted by the previous presiding judge when the Court initially declined to dismiss the Mandamus Act and APA claims. Although this position has some superficial appeal, it does not stand up to close scrutiny. And close scrutiny is called for where, as here, a plaintiff is asking the Federal Judiciary to force the Executive to affirmatively act.[55] This is especially so where the Judiciary would be forcing the Executive to act in an area (like immigration) that implicates foreign policy and national security concerns.[56] In such circumstances, courts should be extremely cautious before concluding that Congress has authorized them to force the Executive's hand in this manner. Courts should closely examine the asserted sources of law that underlie the supposed right to Mandamus Act or APA relief. This Court does so now.

---

[53] Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 16. Mr. Dorobati also adverts to 22 C.F.R. § 42.21(a), which provides that "[a]n immediate relative [of a U.S. citizen] shall be documented as such . . . ." *See id.* at 17–18. But this provision has nothing to do with adjudication of eligibility for a visa. Instead, it relates to an entirely different inquiry: the classification of the non-citizen applicant as an "immediate relative." The regulation states that when "the consular officer has received from DHS an approved Petition to Classify Status of Alien Relative for Issuance of an Immigrant Visa . . . and the officer is satisfied that the alien has the relationship claimed in the petition[,]" the person "shall be classified as an immediate relative . . . ." The regulation further explains that the "immediate relative shall be documented as such unless the U.S. citizen refuses to file the required petition . . . ." But classification as an immediate relative is only one of the necessary prerequisites for being eligible for a visa and does not itself entitle an immigrant to a visa. *See, e.g.*, 22 C.F.R. § 42.41 ("The approval of a petition does not relieve the alien of the burden of establishing to the satisfaction of the consular officer that the alien is eligible in all respects to receive a visa."); *id.* § 42.62(b)(i)–(ii) (treating immigrant classification and eligibility to receive a visa separately); *id.* §§ 42.61–67 (detailing other necessary prerequisites for visa eligibility that exceed mere status as an immediate relative). Because immediate-relative status on its own does not entitle the immediate relative to visa adjudication or approval, this regulation really does not bear on the questions in this case.

[54] Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 14 (emphasis in original).

[55] *See Muñoz*, 602 U.S. at 907; *see also supra* note 12.

[56] *See, e.g.*, *Trump*, 585 U.S. at 702.

Let's begin with the actual language (and structure) of 8 U.S.C. § 1202(b). That subsection provides:

> Every alien applying for an immigrant visa shall present a valid unexpired passport or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Secretary of State. The immigrant shall furnish to the consular officer with his application a copy of a certification by the appropriate police authorities stating what their records show concerning the immigrant; a certified copy of any existing prison record, military record, and record of his birth; and a certified copy of all other records or documents concerning him or his case which may be required by the consular officer. The copy of each document so furnished shall be permanently attached to the application and become a part thereof. In the event that the immigrant establishes to the satisfaction of the consular officer that any document or record required by this subsection is unobtainable, the consular officer may permit the immigrant to submit in lieu of such document or record other satisfactory evidence of the fact to which such document or record would, if obtainable, pertain. All immigrant visa applications shall be reviewed and adjudicated by a consular officer.

Mr. Dorobati points to the last sentence of the foregoing subsection, which states that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer." But it is not at all clear that sentence can bear the weight Mr. Dorobati ascribes to it.

First, there is a strong argument that the last sentence of § 1202(b) isn't a command at all. As Judge Buescher concluded in a similar case, "[r]ead in the context of a long list of requirements for documentary evidence, it is plain that the last sentence [of §1202(b)] does not impose upon a consular officer a nondiscretionary duty to review and to adjudicate a discrete or specific visa application."[57] "Instead," Judge Buescher explains, "the provision describes the documentation that visa applicants must provide, to whom they must provide that documentation, and lastly who will ultimately adjudicate their applications."[58] Other context clues point in the same direction. Section 1202(b) is not generally about the duties of consular officers. Section 1202(b) does not

---

[57] *Hassan*, 748 F. Supp. 3d at 742–43.

[58] *Id.* at 743.

discuss the manner in which a consular officer sets up an interview, reviews an application, or reaches a decision. And the sentence at issue is written in the passive form, which would be an odd way for Congress to express a command to adjudicate.[59]

Second, even if we were to assume that § 1202(b) were a command to review and adjudicate every visa application, no statute or regulation defines the (allegedly) required review and adjudication in a detailed enough way to trigger Mandamus Act or APA relief. Said another way, because what qualifies as review and adjudication in the immigrant visa context is less than clear, there is no mandatory, nondiscretionary duty for the Court to enforce. In some sense, then, it is unnecessary to actually resolve whether the consular officer's initial refusal in our case constituted a review and adjudication under § 1202(b). For present purposes, it is enough to conclude that a reasonable interpretation of § 1202(b)'s review and adjudication language requires no more than the initial refusal. So long as that is true—which the Court believes it to be—than there is no clear duty beyond that for the Court to enforce.

Certainly, there is nothing in § 1202(b), or in § 1202 more broadly, that tells us what counts as review and adjudication.[60] As far as statutes go, the closest we come to learning what an adjudication is derives from 8 U.S.C. § 1201—specifically from the juxtaposition of when a consular officer may issue an immigrant visa and when the consular officer may not do so.

---

[59] 8 U.S.C. § 1202(b) ("All immigrant visa applications *shall be* reviewed and adjudicated *by a consular officer*. (emphasis added)).

[60] Mr. Dorobati seems to be suggesting that a review and adjudication has not been completed because the consular officer can still review, re-evaluate, and re-adjudicate his initial refusal of the visa application. In other words, Mr. Dorobati asserts that the consular officer's decision is not a final one. Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 14. But nothing in § 1202 requires the type of finality that Mr. Dorobati is seeking. Nor does anything in the statute equate a review and adjudication with the type of finality Mr. Dorobati apparently envisions. Remember, we are operating in the realm of Executive decision-making here. Evaluating a visa application is decidedly not a judicial exercise. *See Muñoz*, 602 U.S. at 908 ("The Immigration and Nationality Act (INA) does not authorize judicial review of a consular officer's denial of a visa; thus, as a rule, the federal courts cannot review those decisions."). And "[e]xecutive immigration decisions, unlike judicial judgments, necessarily fluctuate and so do not possess the finality associated with ordinary civil or criminal cases." *Qatanani v. Att'y Gen.*, 144 F.4th 485, 508 (3d Cir. 2025) (Matey, J., dissenting).

12

Section 1201(a)(1)(A) tells us that, "[u]nder the conditions hereinafter prescribed and subject to the limitations prescribed in this chapter or regulations issued thereunder, a consular officer may issue . . . to an immigrant who has made proper application therefor, an immigrant visa . . . ."[61] And § 1201(g) tells us that "[n]o visa or other documentation shall be issued to an alien if (1) it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa . . . , (2) the application fails to comply with the provisions of this chapter, or the regulations issued thereunder, or (3) the consular officer knows or has reason to believe that such alien is ineligible to receive a visa . . . ."[62]

But even § 1201 doesn't make plain what counts as a review and adjudication. So we look to the implementing regulations. And what we find is 22 C.F.R. § 42.81. This regulation provides that "[w]hen a visa application has been properly completed and executed before a consular officer in accordance with the provisions of the INA and the implementing regulations, the consular officer must issue the visa[ or] refuse the visa . . . ."[63] (Recall, of course, that the application is completed and executed at the consular interview.[64]) Therefore, if anything clearly qualifies as a review and adjudication, it would be the consular officer's decision to issue or refuse a visa after the officer's interview of the applicant. But that has already occurred in our case. The consular officer interviewed Mr. Dorobati's wife and then refused her visa application. There is no clear duty for the consular officer to do more.

Without a clear duty to take another step, 5 U.S.C. § 555 is of no use to Mr. Dorobati. The Supreme Court has made plain that § 555's reasonable-time and matter-completion requirements

---

[61] 8 U.S.C. § 1201(a)(1)(A).

[62] *Id.* § 1201(g).

[63] 22 C.F.R. § 42.81(a); *see also supra* note 26 (acknowledging a third option that is inapplicable to the current case).
[64] *See* 8 U.S.C. §§ 1201(a)(1), 1202; 22 C.F.R. § 42.62.

13

can only be judicially enforced with respect to a "*discrete . . . action*" that the Department "*is required to take*."[65] And, as just discussed, even if we assume the Department is required to review and adjudicate all visa applications, the only discrete action required is the consular officer's issue-or-refuse decision after the consular interview. As to the details and timeline of post-refusal actions like administrative processing, there's just no "positive command so plainly prescribed as to be free from doubt."[66] And in the absence of a statute or regulation that provides clear commands, administrative processing and any outcomes that result from that processing are all matters of executive grace and discretion. They are not fodder for judicial imperialism under the Mandamus Act or the APA.[67]

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's Motion for Reconsideration. Mr. Dorobati's current Mandamus Act and APA claims are dismissed. Given the prior Order in this case, that leaves no live claims. A final judgment will issue.[68]

---

[65] *See Norton*, 542 U.S. at 64.

[66] *See Mitchael*, 809 F.3d at 1054 (quotation marks omitted) (quoting *Keeny*, 437 F.2d at 1152). The Court notes that 22 C.F.R. § 42.81(c) seems to require that the principal consular officer eventually review a consular officer's refusal of a visa application. Mr. Dorobati is not arguing for such review, and he does not suggest § 42.81(c) is the source of any relevant command. The Court also notes that 22 C.F.R. § 42.81(e) requires, in certain circumstances, reconsideration of a consular officer's refusal of a visa application. Mr. Dorobati is not arguing for such reconsideration, and he explicitly disclaims 22 C.F.R. § 42.81(e) as a source of any relevant command. Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 14 ("Defendants are correct that 22 C.F.R. § 42.81(e) is 'not implicated in this case' nor does Plaintiff Dorobati represent that it is." (citation omitted)).

[67] Mr. Dorobati asserts that the State Department's website "strongly suggests" that "the Department does not view a Section 221(g) refusal for administrative processing to be a final adjudication." Pl.'s Resp. in Opp'n to Def.'s Mot. for Recons. (Doc. 28) at 15 (quoting *Mobayen v. Blinken*, 780 F. Supp. 3d 969, 982 (C.D. Cal. 2025)). The Court need not dwell on the specifics of this argument, nor on whether Mr. Dorobati correctly interprets the statements on the Department's website. The language the website uses to discuss the process is a red herring. A mandatory, nondiscretionary duty that triggers Mandamus Act or APA relief must derive from statute or regulation; it cannot come from website statements. *Cf. Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (even when federal courts gave deference under *Chevron* to agency interpretations of ambiguous statutes, agency statements—which do not require any formal adjudication or any notice-and-comment rulemaking—were not afforded any weight or force of law).

[68] The Court does not need to reach—and therefore does not reach—the other arguments made by the Deputy Chief. This includes arguments related to the consular nonreviewability doctrine and the application of the TRAC factors.

The Court wishes, however, to re-emphasize one thing.  That Congress has not provided federal courts with expansive statutory authority to force the Executive's hand on immigrant visa decisions is hardly surprising.[69]  The field of immigration is not traditionally the place where Congress invites the Federal Judiciary to tinker around with policy decisions best left to the political branches.[70]  And for good reason.  This area of the law almost always implicates questions of national security, "changing political and economic circumstances," and sensitive "relations with foreign powers . . . ."[71]  Accordingly, policy decisions in this area—even ones dressed up as process issues—"are frequently of a character more appropriate to either the Legislature or the Executive."[72]  That is certainly true here.

---

[69] *Cf. Muñoz*, 602 U.S. at 907–08 ("Congress may delegate to executive officials the discretionary authority to admit noncitizens 'immune from judicial inquiry or interference.' . . . When it does so, the action of an executive officer 'to admit or to exclude an alien' 'is final and conclusive.'" (internal citation omitted) (first quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–91 (1952), then quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950))).

[70] *See Kleindienst v. Mandel*, 408 U.S. 753, 765–66 (1972) ("[T]he power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government[;] . . . [T]he Court's general reaffirmations of this principle have been legion." (internal quotation marks omitted) (citing *Ping v. United States*, 130 U.S. 581, 609 (1889), and, *Fong Yue Ting v. United States*, 149 U.S. 698 (1893))); *see also Qatanani*, 144 F.4th at 520 n.40 (Matey, J., dissenting) ("[P]roper respect for the political branches' plenary power over immigration has repeatedly moved the courts against second guessing their judgment.").

[71] *Trump*, 585 U.S. at 702 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)); *see also id.* at 704 ("'[J]udicial inquiry into the national-security realm raises concerns for the separation of powers' by intruding on the President's constitutional responsibilities in the area of foreign affairs." (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017))); *Biden v. Texas*, 597 U.S. 785, 805 (2022) ("[T]he Court has taken care to avoid the danger of unwarranted judicial interference in the conduct of foreign policy, and declined to run interference in the delicate field of international relations without the affirmative intention of the Congress clearly expressed. . . .  That is no less true in the context of immigration law, where the dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." (cleaned up) (first quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115–16 (2013), then quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012))).

[72] *Trump*, 585 U.S. at 702 (internal quotation marks omitted) (quoting *Mathews*, 426 U.S. at 81).  Whether and when Congress can authorize a court to interfere with the Executive in this field is a question for another day.  For today, it is enough to say that, if a court thinks Congress has authorized it to require the Executive to affirmatively act in the immigration context, that court should look twice to make darn sure of its authority.  *See supra* note 12.

IT IS SO ORDERED this 12th day of January 2026.

                                                                  /s/ Lee P. Rudofsky  
                                                          LEE P. RUDOFSKY  
                                                          UNITED STATES DISTRICT JUDGE